ALVIN AND PHYLLIS JANKLOW, ET AL., [1] PETITIONERS V. COMMISSIONER OF INTERNAL REVENUE, Respondent Janklow v. Commissioner
Docket Nos. 14638-81; 11759-82; 4189-83; 9687-83; 18420-83; 13267-84.
United States Tax Court
T.C. Memo 1988-46; 1988 Tax Ct. Memo LEXIS 40; 55 T.C.M. (CCH) 69; T.C.M. (RIA) 88046; February 11, 1988; As amended February 23, 1988 Edward B. Simpson and John Gigounas, for the petitioners. Barbara M. Leonard, for the respondent. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: Each of these consolidated cases involves deductions and investment tax credits claimed by petitioners with respect to their purchases of video tapes from Del Vida International, Inc. (Del Vida). [2] By amendment to answer respondent asserted that petitioners, with the exception of petitiners William and *42 Mary Jane Putman, are also liable for additional interest under section 6621(c)[3] on the portions of the underpayment of tax attributable to a tax motivated transaction. [4]
*43 After concessions, [5] the issues for decision are: (1) Whether petitioners are entitled to the deductions and credits claimed in connection with their purchases of the Del Vida video tapes; (2) Whether petitioners are entitled to deduct interest paid on the notes used in the purchases of the video tapes; (3) Whether petitioners Charles and Agnes Fishel, Alvin and Phyllis Janklow and Roman and Lorraine Oleynik are liable for the additions to tax for negligence pursuant to section 6653(a); (4) With respect to petitioners Roman and Lorraine Oleynik only, whether they are liable for the additions to tax pursuant to section 6653(a)(2); and (5) With one exception, whether petitioners are liable for the additional interest under section 6621(c). [6]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation *44 of facts, the supplemental stipulations of facts and attached exhibits are incorporated herein by reference. Petitioners resided in California at the time the petitions were filed. In 1977 and 1978, each petitioner purchased a video tape containing the master recording of an entertainment program. [7] Petitioners bought the video tapes from Del Vida, a California corporation which produced entertainment programs on video tape. Although the purchases were made independently, the purchase prices and contracts were virtually identical for each petitioner. Petitioners [8] are a diverse group. Except for Marvin, William, John and Robert Struiksma, who are all related, petitioners had only the investments in Del Vida video tapes in common. The Struiksmas worked for West Coast Sand & Gravel Company, Inc., the family business, in various managerial positions. Roman J. Oleynik (Oleynik) was a doctor and Alvin C. Janklow (Janklow) was a dentist. William Putman (Putman) was the vice president of *45 administration and comptroller for a closely held corporation. Charles V. Fishel (Fishel) was a tax attorney and was president of a consulting firm for emerging businesses. Forrest R. Whitcomb (Whitcomb) was a retired airline pilot. All of petitioners had made other investments before purchasing the Del Vida tapes. Some of these prior investments were profitable and some were not. The video tapes purchased by petitioners came from four entertainment series, each comprised of 13 half-hour episodes. The series were entitled "Magic, Magic, Magic," "Sari's Celebrity Brunch," "Music Country" and "Hollywood Cabaret." Although Del Vida was in the business of producing entertainment programs, it did not produce the four series involved here. Rather Del Vida solicited One Pass Video to make "Magic, Magic, Magic" and Random Production to produce "Music Country," "Sari's Celebrity Brunch" and "Hollywood Cabaret." Del Vida paid $ 40,420 for "Magic, Magic, Magic, *46 " $ 45,000 for "Music Country," $ 26,000 for "Sari's Celebrity Brunch" and between $ 39,000 and $ 65,000 for "Hollywood Cabaret." In addition Random Productions charged $ 200 for each copy of the tape. According to Don Murphy (Murphy), Del Vida's vice president during 1977 and 1978, Del Vida wanted to exploit the nascent home video market for video cassette recorders (VCR's). In the late 1970's individual ownership of VCR's was still relatively uncommon but Del Vida expected it to increase dramatically. One of Del Vida's goals was to produce high quality family entertainment video tapes to sell to the new VCR owners. The programs Del Vida sold were also suitable for independent television stations both in the United States and abroad. The programs sold by Del Vida to petitioners were family entertainment shows. "Music Country" was a country music variety show hosted by recording star Jimmie Rodgers. The show featured performances by well known country and western musicians. [9] "Magic, Magic, Magic" featured professional magicians in live performances at a San Francisco nightclub. Each show was preceded by an announcement that camera tricks were not used to either create or *47 augment the magic acts. "Sari's Celebrity Brunch" was a talk show in which the actress Sari Mitchell interviewed films and television stars in a restaurant setting. [10] "Hollywood Cabaret" was a musical variety show ohsted first by the late Dick Haymes and then by Johnnie Ray. [11] Each of the 13 separate episodes was contained on an individual video tape. Del Vida sold these video tapes separately. None of petitioners knew the identity of all the other owners in the series in which he invested. Each *48 petitioners had learned of the Del Vida video tapes from his financial advisor. Andrew Vanderzwaag (Vanderzwaag) and Bud Hogberg (Hogberg) informed the Struiksma family about the Del Vida video tapes. Vanderzwaag purchased a half interest in a tape himself. Jerry Ball (Ball) counselled Janklow. Petitioners Oleynik and Fishel learned of the Del Vida video tapes from Roy Peterson (Peterson) while Ron Berg (Berg) advised petitioner Putman. John Doherty (Doherty) was the financial advisor for petitioner Whitcomb. The financial advisors who testified at trial [12] had investigated the video tape business for its investment potential before advising petitioners to invest. Peterson was himself a movie producer and understood the peculiarities of the video tape market. Both Berg and Vanderzwaag had watched the filming of video tapes, although not the video tapes in issue. Hogberg was primarily a salesman of video tapes but had little experience with either the production or the distribution of video tapes. Ball researched the home VCR market as well as independent television stations. Each of them believed that the Del Vida video tapes represented an investment opportunity in a risky *49 but potentially lucrative and quickly growing industry. Petitioners were told that the tapes were a good investment, although they were not shown any income projections to support that claim. [13]
The advice given to petitioners was drawn primarily from the promotional material which had been sent by Del Vida to the respective financial advisors. This material included tax opinions from two law firms; Stoermer & Stein, and Reedy, Lans & Crockett, both professional corporations operating under the laws of California. The author of one of the tax opinions, Phillip Stoermer (Stoermer) was a shareholder in Del Vida during the years *50 in issue. Stoermer's opinion outlined the benefits available from depreciation using the double declining balance method, from interest expense deductions, from any losses which might occur and from the investment tax credit. In a subsequent letter, Stoermer informed Del Vida of a change in respondent's position on the at-risk limitations of section 465, as set forth in a revenue ruling. [14] Stoermer advised Del Vida that the tax positions they were endorsing might be challenged and that the terms of the financing note should be altered. The note petitioners signed reflected Stoermer's recommendations. The opinion letter from Reedy, Lans & Crockett mentioned many of the same tax advantages, and added a discussion of the transaction's implications under the securities laws. Although the promotional material did not contain a projection of anticipated revenue or any forecast of profitability, it promised that the video tapes would be a good financial investment. Each petitioner was informed of the tax benefits that would flow from the purchase. [15]
*51 Not one of petitioners investigated the video tape investment beyond the financial advice given. No one examined the history and qualifications of the production companies which created the Del Vida tapes. Most of petitioners did not know which production company had made their video tapes. No petitioner obtained an independent appraisal of his video tape before purchase or consulted an advisor with expertise in the marketing of entertainment programs. None of petitioners researched the VCR market and its growth potential, or the independent television station market. At the time of the purchase, none of petitioners had a very clear understanding of the distribution process. None of petitioners attempted to alter the contract terms, the conditions of the note or the amount of the purchase price. Not one of petitioners asked about the owners of the other 12 episodes in the series in whch he invested, although the individual episodes were nearly valueless alone. [Text Deleted by Court Emendation] Putman did not inquire as to the financial status of Evelyn Eichinger (Eichinger) who was the co-owner of "Sari's Celebrity Brunch Number 13." Janklow knew nothing at all about his co-owner *52 in "Magic, Magic, Magic Number 2," although both Janklow and Donald Brownlee (Brownlee) signed the promissory note in the amount of $ 92,000. Not one of petitioners ever viewed his video tape before purchasing it. [16]
The following chart indicates the identity and date of purchase of the respective video tapes: Petitioner
Date of Purchase
Tape
Janklow &
[17](Brownlee) Dec. 14 1977
Magic, Magic, Magic #2
Whitcomb
April 1 1978
Magic, Magic, Magic #9
Putman &
(Eichinger)
April 28, 1978
Sari's Brunch #13
Oleynik
Sept. 19, 1978
Music Country #10
M. Struiksma &
W. Struiksma
Dec. 22, 1978
Hollywood Cabaret #4
J. Struiksma
Dec. 22, 1978
Hollywood Cabaret #6
R. Struiksma &
(Vanderzwaag)
Dec. 22, 1978
Hollywood Cabaret #5
Fishel
Oct. 31 1978
Music Country #9
The stated purchase price of each video tape was $ 100,000. Each petitioner made a down payment *53 of $ 10,000 which was divided between principal and prepaid interest. [18] The remainder of the purchase price was paid through a promissory note. The amount of the note varied depending on when the purchase occurred during the year. [19]
The terms of the note purported to impose full recourse liability for 7 years. [20] The note required *54 an annual minimum interest payment of $ 2,000 per year for 7 years. Any additional payments during the first 7 years could come only from distribution proceeds. These payments from proceeds would be credited toward interest during the first 3 years and then allocated between interest and principal. During this time, the note's maker must have expended reasonable efforts to distribute the video tape. At the end of 7 years the note purported to convert to nonrecourse liability if the maker paid principal in the amount of $ 1,000 and if 1 of 3 conditions was satisfied. The note would become nonrecourse if (a) the proceeds from distribution of the tape created net receipts which equalled the sum of all interest due plus one-third of the principal due or (b) if the video was licensed to a distributor whose gross distribution receipts over the previous two years exceeded $ 1,000,000 per year [21] or (c) if 1,500,000 total units of VCR's [22] or video tape players had been sold. [23] The video tapes were the collateral for the note although Del Vida never perfected its security interests under California statute. Del Vida did not require petitioners to submit financial statements prior *55 to their respective purchase. In addition to signing the promissory note, each petitioner signed other documents manifesting the passing of title. A document entitled "Storage of Master Video Tape" informed the production company in possession of the video tape that there was a new owner. Petitioners conveyed all copyright privileges to Del Vida *56 for one dollar. [24] The terms and conditions of the sale were embodied in the Production Service Agreement, signed by each petitioner. [25] This agreement delineated the rights and duties of both parties. Del Vida promised to transfer full, complete and unencumbered rights to the video tape and the program it contained. Petitioners promised to pay the full contract price of $ 100,000 and to distribute the video tape. Del Vida bore the entire risk of loss for the unpaid balance of the purchase price and was required to insure the tapes even after the purchase. if the video tape was lost or damaged the remaining indebtedness would be excused. Once the purchase was complete petitioners took steps to distribute their video tapes. The distributor must match the program he is selling to the individual television stations, and must convince the station to show his program rather *57 than the programs currently running. This particularized selling requires an extensive knowledge of the peculiar programming needs of different independent television stations all across the country. In 1978, upon the recommendation of their respective financial advisors, petitioners engaged International Communications Consultants (ICC) to manage the distribution of their video tapes. ICC was a new company with scant distribution experience. ICC managed the distribution effort for several years, and corresponded occasionally with petitioners. ICC reassured petitioners that it was making strong efforts to distribute the video tapes. ICC's efforts were only slightly successful. All the Del Vida video tapes were licensed in a package of approximately 100 video taped shows to KOUS-TV in Billings, Montana. KOUS-TV paid approximately $ 15 per video tape and received the right to unlimited showings. [26] The Del Vida video tapes were aired in December of 1980 and January of 1981. [27] Since those showings they have not been sold, licensed or publicly viewed. In 1981, ICC resigned and, on ICC's recommendation, Graphic Entertainment Media (GEM) took over the distribution effort. No *58 evidence was presented to indicate the reasons for ICC's withdrawal. Both ICC and GEM were paid for their distribution endeavors. Petitioners never complained about either distributors' dismal performance. Petitioners faithfully made the minimum interest payments through 1980. Although petitioners all stopped making the full minimum interest payments in 1981, Del Vida has never taken action to compel payment or to institute foreclosure proceedings. Del Vida decided to put off collection of the delinquent minimum interest payments until after the tax investigation and subsequent litigation was resolved. Petitioners claimed deductions, and tax credits with respect to their acquisition of the video tapes from Del Vida (see Appendix B). In addition, petitioners claimed interest deductions with respect to the payments made on the notes to Del Vida. Respondent disallowed the deductions and credits, claiming, chiefly, that petitioners had not purchased their video tapes with intent *59 to make a profit. Furthermore, respondent maintained that the promissory notes did not evidence a bona fide indebtedness. In addition, respondent determined that some petitioners are liable for additions to tax for negligence under section 6653(a) for some of the taxable years and, with respect to petitioners Oleynik only, additions to tax under section 6653(a)(2) for some taxable years. In the amended answer respondent also alleged with respect to all petitioners, except petitioners Putman, that a portion of each underpayment determined was attributable to a tax motivated transaction within section 6621(c). OPINION The first issue for decision is whether respondent properly disallowed petitioners' depreciation deductions and investment tax credits taken during the years in issue. Petitioners J. Struiksma, M. Struiksma, R. Struiksma, Putman and Oleynik also took deductions for management fees or miscellaneous expenses accrued in relation to their purchase and distribution of the Del Vida video tapes. Each of these items was appropriate only if the purchases of the Del Vida video tapes were investments for the production of income or for use in a trade or business. An investment *60 is used in a trade or business, or held for the production of income only when the investor enters into the transaction with the actual and honest objective or making a profit. Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Respondent's primary argument is that petitioners did not purchase or hold the Del Vida video tapes with the intention of making a profit. Respondent further contends that petitioners' purchases of the Del Vida video tapes were motivated by tax avoidance. Petitioners argue that the record establishes that they were primarily motivated by profit objective and that the deductions and the credits were properly taken. Petitioners bear the burden of proving this. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Whether a taxpayer had an actual and honest profit objective is a question of fact to be resolved from all the surrounding facts and *61 circumstances. Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The parties have framed the issue in terms of whether petitioners' activities were not engaged in for profit within the meaning of section 183, which imposes a subjective test. The regulations promulgated under section 183 provide a list of factors that are to be considered in determining the existence of subjective intent.[28]Jasionowski v. Commissioner,66 T.C. 312, 321 (1976). In addition to a subjective test, we have also employed an objective test, pursuant to which transactions have been disregarded for Federal income tax purposes where they are devoid of economic substance. For an analysis of the development of the law in this area see Rose v. Commissioner,88 T.C. 386, 408-415 (1987). In Rose v. Commissioner, supra, we determined it was preferable to analyze certain transactions, the so-called "generic tax shelters," under a unified approach emphasizing objective factors into which the historic subjective and objective tests would merge. Rose v. Commissioner, supra at 412-415. *62 The test incorporates factors relied upon in cases decided under section 183 as well as concepts underlying sections 38, 162, 167 and 212. [29]
The Del Vida video tape investment possesses each of the characteristics articulated in Rose v. Commissioner, supra, as the criteria establishing a generic tax shelter. The promotional materials focused on the tax benefits of the transaction; the demanded purchased price was accepted without negotiation; the right to commercially exploit the video tapes *63 is difficult to value in the abstract and the value placed on this right greatly exceeded the value of the storage medium, the video tape itself; the cost of producing the video tapes was a fraction of the stated purchase price; and the bulk of the purchase price was deferred through promissory notes which were nonrecourse in substance. Rose v. Commissioner,88 T.C. at 412. Accordingly, we have determined that petitioners' activity with respect to the Del Vida video tapes, falls within the definition of a generic tax shelter. We will apply the Rose test to decide whether petitioners' investments in the Del Vida video tapes were devoid of economic substance. [30]
The Rose analysis requires that we look for objective indications of economic substance in the purchase of the Del Vida video tapes, relying on four factors. These factors are (1) the dealing between petitioners and the promoters; (2) *64 the relationship between the sales price and the fair market value; (3) the structure of the financing; and (4) perceived congressional intent. A. The Dealings Between Petitioners and Del Vida
Petitioners' purchases of video tapes from Del Vida were unusual investment transactions. Considering the stated purchase price of $ 100,000 apiece for the video tapes, in conjunction with petitioners' total ignorance of the entertainment industry, petitioners displayed extraordinary passivity and trustfulness in relying on the advice of their financial counselors. None of petitioners was knowledgeable about video tapes before the purchases. Similarly, petitioners were not familiar with the home VCR market and independent television stations, nor were they knowledgeable about the production or distribution of entertainment programs. None of petitioners were acquainted with anyone who did know about these various aspects of the investment, except for the Del Vida representatives. The financial advisors, upon whose good judgment petitioners relied, also lacked independent knowledge or experience concerning the production of entertainment programs or the process of marketing and distribution. *65 Petitioners were aware of this. Petitioners did not make an independent decision to enter the world of entertainment programs or to tap the burgeoning home VCR market. Rather, each learned of the investment possibilities from his respective investment advisor whose knowledge was limited to the contents of the Del Vida promotional materials. Even after they learned about the Del Vida video tapes petitioners continued to be completely passive, declining to undertake any independent research or efforts to insure the success of their investment. [31] Thus, in light of their own ignorance and inexperience, petitioners' complete dependence on their financial counselors was irrational, unless it was the paper tax losses and not the real cash profits that petitioners sought.
The promotional materials *66 prepared by Del Vida shed more light on the true nature of the video tape purchases. While each petitioner testified that he had been informed that the video tape would be profitable, the record indicates that none of petitioners was given data to support this. No income forecasts or other projections were included in the promotional materials. See West v. Commissioner,88 T.C. 152 (1987) (conspicuous absence of specific or general profit projections in the prospectus indicated the taxpayer's lack of actual and honest profit motive). Although there was little information concerning the profitability of the Del Vida video tapes in the promotional materials, the record does show that the tax consequences of the transaction were discussed. The promotional materials contained two tax opinions from law firms. Both opinions were detailed and comprehensive in their discussion of the tax benefits which would flow from the purchase of the Del Vida video tapes. The importance given to tax considerations in the promotional material shows the true nature of the transaction. Petitioner's unhesitating willingness to pay the demanded purchase price indicates that the transaction *67 involved herein was devoid of any arm's-length negotiations. Not one of petitioners obtained an independent appraisal or conducted even a minimal investigation into the real value of the video tape prior to purchasing it. Petitioners unquestioningly accepted all the terms and conditions of sale. Once the video tapes had been acquired, petitioners pursued the distribution of the video tapes in what can only be described as a lackluster manner. Petitioners engaged ICC on the advice of their financial counselors, without independent investigation into the company's past record or potential liabilities. Not one of petitioners contemplated an alternative distribution scheme. When GEM took over from ICC, petitioners did not question that it had been recommended by ICC, a proven loser. Despite the fact that ICC received the tapes in 1978, not one of petitioners expressed concern to ICC for its two years of failure. When the video tapes were licensed to KOUS-TV most of petitioners were unaware of the transaction and did not demand their shares in the proceeds. None of petitioners were acquainted with all the owners of the other 12 episodes. Petitioners were unsure of whether the *68 other owners had engaged ICC and then GEM to undertake the distribution efforts, although the individual episodes were nearly worthless alone. All in all petitioners manifested in attention, nonchalance and ignorance throughout the entire transaction. Like the taxpayers in a case involving a nearly identical factual situation, petitioners exhibited "a complete disregard of the practical economic and business concerns inherent in [the] purchase and exploitation [of the video tapes involved] especially in view of the lack of expertise displayed by all parties * * *." Baigent v. Commissioner,T.C. Memo. 1987-314. [32]
B. The Relationship Between the Purchase Price and Fair Market Value
Each petitioner ostensibly undertook to pay the entire purchase price of $ 100,000 for his Del Vida video tape. The substance of the transaction reveals that the actual price was $ 25,000: the down payment in the amount of $ 10,000 and annual interest payments in the amount of $ 2,000 for 7 years, plus the $ 1,000 payment due at the end of the 7-year term. Nonetheless, the purchase price was purported *69 to be $ 100,000 and that is the figure we must consider. Petitioners introduced two expert witnesses at trial. The first witness was a tax lawyer, who has been tax counsel to a number of well known corporations and has been admitted to several state bars. However, there was no indication that the lawyer knew anything about the valuation of video tapes containing entertainment programs, and the report was not helpful to us in determining the true fair market value of the Del Vida video tapes. Petitioners' second witness, Andrew Trentacosta (Trentacosta) testified directly concerning the question of value. Trentacosta has worked primarily in programming for cable television, public television and subscription television. His duties consisted of viewing and screening television programs and selecting those that would be aired. Trentacosta determined that the del Vida video tapes contained high quality entertainment. Trentacosta further submitted a projection of expected revenue which could be derived from various markets. Trentacosta anticipated that each Del Vida video tape would produce approximately $ 17,500 per year for 7 years from sales to commercial television, an average *70 of $ 10,000 per year for 7 years from cable television, $ 300 from the Armed Services, approximately $ 3,000 from in-house video systems in large hotel and motel chains, about $ 500 per year from sales to foreign television stations. The projected income for the first 7 years was: Customer
Income
Commercial Television, for 7 years
$ 122,500
Cable Television, for years
70,000
Armed Services
300
Hotels and Motels
3,000
International Television
[33] 52,500
$ 248,300
Trentacosta then subtracted 35 percent of gross revenue as a distribution fee leaving a net projected revenue figure of $ 161,395. Finally Trentacosta added $ 1,500 for sales to *71 home VCR owners producing a final projection of revenue in the amount of $ 162,895. Trentacosta did not submit a separate estimate for fair market value at the time of acquisition, noting that with entertainment programs the projection of income was the most useful and accurate assessment of value. On cross-examination Trentacosta conceded that much of his estimated income projection was unduly optimistic. Acknowledging that he had extremely limited experience in the distribution of video tapes, Trentacosta admitted that, in general, sales of a single video tape to cable television and to commercial television would be mutually exclusive. He further agreed that, in order to be considered valuable, most shows should be comprised of at least 100 episodes, not just 13 and that a show consisting of only 13 episodes would be difficult to distribute. Furthermore, his figures were based on the premise that the video tapes could be licensed as first run programs in half of the total geographical programming markets. Trentacosta retreated from his position concerning sales to hotel or motel chains, agreeing that they generally buy first run movies or subscribe to cable programming and *72 are not usually interested in special programs such as the programs contained in the Del Vida video tapes. On the subject of the anticipated sales to foreign television networks, Trentacosta denied that these would be difficult to achieve although he acknowledged that there were restrictions on imported broadcasting in English speaking countries. For sales to non-English speaking countries the video tapes would have to be dubbed at considerable expense although Trentacosta maintained that the programs would be equally marketable if not translated. Accordingly, we conclude that Trentacosta's report of projected income was excessively optimistic and without foundation in fact. [34]
Respondent's expert witness, Frank Reel (Reel), is well known to this Court, having testified on the value of film and video tapes in several other cases. Reel's credentials are impressive. He is a lawyer *73 specializing in entertainment law. He has been executive vice president of ZIV Television Programs, Inc., the predecessor to United Artists Television, Inc., and later president of Metromedia Producers Corporation. Reel has also written a book about television networks. Reel submitted evaluations of the Del Vida video tapes in issue. He described the contents of each video and made the following estimates of value: Maximum
Series
Value
Anticipated Revenue
Sari's Celebrity Brunch
$ 1,000 per episode
$ 2,000 per episode
Magic Magic Magic
1,500 per episode
3,000 per episode
Music Country Music
4,000 per episode
8,000 per episode
Hollywood Cabaret
4,000 per episode
8,000 per episode
Reel's estimate of present value equals one-half of the maximum anticipated revenue because distribution fees were actually 50 percent rather than 35 percent as Trentacosta suggested. Reel's valuations are based not only on the quality of the programs contained in the Del Vida video tapes but also on his understanding of television programming. He noted that it was unusual for a series to be produced with 13 initial episodes. He explained that producers generally *74 make one episode, the pilot, and wait to make more episodes until the pilot's success is assured. Once that occurs many episodes are made because only a series with 100 or more episodes is considered valuable. Reel determined that the Del Vida video tapes could not be sold to commercial television stations. In Reel's opinion the major cable companies would not be interested, leaving only smaller companies, of which there were few prior to 1981. The Del Vida video tapes contain blank spots for the insertion of advertisements, Reel noted, making them unsuitable for viewing in a home VCR. Expert opinions are admissible and relevant to the issue of value but we must weigh those opinions in light of each expert's qualifications and all other relevant evidence of value. Anderson v. Commissioner,250 F2d 242, 249 (5th Cir. 1957), affg. a Memorandum Opinion of this Court; Johnson v. Commissioner,85 T.C. 469, 477 (1985). We may reject expert testimony when in our best judgment it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282, 295 (1938); Chiu v. Commissioner,84 T.C. 722, 734 (1985). *75 The reports on value submitted by the parties differ drastically but, in light of Reel's credible testimony as well as his impressive experience and qualifications, we adopt the figures from his report. Not only were Trentacosta's figures unrealistic but his own support for his findings was equivocal under respondent's cross-exmination. Upon consideration of the conflicting testimony of the expert witnesses, we have determined that the stated purchase price is grossly disproportionate to the actual value. Reel, whose findings we embrace, has determined the fair market values of the Del Vida video tapes to be between $ 1,000 and $ 4,000 apiece. Petitioners knew nothing about the actual value of the video tapes at the time of acquisition. None of petitioners obtained an independent appraisal. Rather they relied completely on unsupported assertions of future profitability. Despite petitioners' ignorance of the fair market value of the Del Vida video tapes at the time of acquisition, we cannot overlook the glaring disparity between the purchase price and the true value. Here the fair market value was only 4 percent of the stated purchase price and this overvaluation undermines *76 petitioners' contentions. The record makes it obvious that the $ 100,000 stated purchase price was illusory and far in excess of the actual value. Even if petitioners actually believed that the purchase price reflected actual value at the time of acquisition they apparently soon changed their minds. Their desultory and ineffectual attempts to distribute the video tapes show that they had abandoned any notions of profitability. C. Structure of the Financing
The presence of deferred debt that is in substance or in fact not likely to be paid is an indication of a lack of an exaggeration of economic substance. Knetsch v. United States,364 U.S. 361 (1960); Rose v. Commissioner,88 T.C. at 419. We look to the substance and not the form of such debt. Waddell v. Commissioner,86 T.C. 848 (1986). Where the note's sole source of repayment is the asset securing it and that asset has little or no ascertainable value, it is uncertain whether the note will be paid and the note is treated as a contingent liability. Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). *77 The terms of the promissory note signed by petitioners purport to impose full recourse liability for the first 7 years. At the end of the 7-year period the occurrence of 1 of 3 events would cause the note to become nonrecourse. The three triggering events were (1) the receipt of revenue in the amount of all the interest due plus one-third of the principal; (2) the licensing of the video tapes to a successful distributor; or (3) the point where total sales of VCR's to individuals reached a figure of $ 1,500,000. [35] The note demanded a minimal interest payment of $ 2,000 per year. Additional interest and principal could only be paid out of proceeds from distribution. According to Reel, the video tapes' total gross receipts would never exceed $ 8,000 per video tape. Distribution fees would extract half of that. Thus, there would be no revenue to apply to the note, and an expectation to the contrary would be a fantasy. Thus, only the $ 15,000 the sum of the minimum annual interest payments for 7 years plus the conversion fee of $ 1,000, would be recourse. Other aspects of the transaction indicate that the parties never *78 contemplated the payment of the full $ 100,000 price. Del Vida never required petitioners to submit books and records showing financial strength although Del Vida ostensibly loaned petitioners $ 90,000 apiece. Furthermore, petitioners stopped making interest payments in 1981 when respondent's investigation began. Nonetheless, Del Vida had not taken any steps to compel payment. This was due to Del Vida's tacit acknowledgment that the promissory notes never evidenced true indebtedness. Finally the dual nature of the note is ludicrous. The three conditions whose occurrence purports to transform the notes from recourse to nonrecourse were illusory. The proceeds from the Del Vida video tapes, under the best possible circumstances and coupled with the most extraordinary luck, could never equal the sum of all the interest due plus one-third of the principal. The second condition, the licensing of the video tapes to a distributor with $ 2,000,000 in revenues, was almost as unlikely. The distribution effort was handled by ICC and then GEM, both new entrants to the field. With little experience, contacts or knowledge it is difficult to imagine that these companies could distribute *79 the Del Vida video tapes to a successful distributor. Finally, the third condition, which was based on the number of VCR's sold, was meaningless since there was no method chosen for establishing how many VCR's had been sold. None of petitioners seemed to think this was very important. We believe that this insouciance was based on their knowledge that the notes were nonrecourse all along. D. Perceived Congressional Intent
The forth factor considered in Rose v. Commissioner, supra, examines the argument that petitioners were merely taking advantage of congressionally enacted tax incentives. Petitioners in the instant case did not make this argument. Nonetheless we do not believe that the Del Vida video tapes are the type of investment that Congress desired to encourage. While Congress may or may not wish to spur the production of video tapes containing entertainment material of debatable value, it is inconceivable that Congress would endorse the true nature of the Del Vida video tape transaction, the naked sale of tax benefits. E. Conclusion
Using the Rose analysis it is evident that petitioners' acquisition of the Del Vida video tapes represents *80 a generic tax shelter without economic substance. Because the transaction has neither economic substance nor profit motive petitioners' depreciation deductions and investment tax credit were improper. Similarly the deductions for management fees and miscellaneous expenses taken by J. Struiksma, M. Struiksma, R. Struiksma, Oleynik and Putman were improper because petitioners' activity was neither a trade or business nor was it conducted for the production of income. Because we resolve this question against petitioners, we do not need to reach their arguments concerning the validity of the regulations under section 48. Furthermore, because petitioners' video tapes were not depreciable property we need not determine either the proper basis for depreciation as petitioners requested or whether the video tapes owned by petitioners J. Struiksma and R. Struiksma were ever placed in service. Interest Deductions
The second issue for our determination is whether petitioners are entitled to deductions for interest paid on their respective promissory notes. Respondent urges us to deny these deductions because there was no underlying indebtedness. Indeed, we have determined that the *81 full stated amount of the liability, in amounts ranging from $ 90,583 to $ 95,250, was not full recourse debt, because the sole vehicle for repayment was distribution proceeds. In Estate of Baron v. Commissioner,83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986), we considered a promissory note which was to be repaid from distribution proceeds alone: The long and short of the matter is that, in the case before us, the value of the rights in the master recording lay solely in the anticipated income stream derived from direct and total public acceptance and that [the taxpayer] was liable on the nonrecourse note only out of his receipts from that income stream. If there were no receipts, there was no obligation to pay. * * *
83 T.C. at 552. Where the repayment is so uncertain, the note represents only a contingent liability and not a true indebtedness. Similarly, where the purchase price substantially outweighs the value of the asset the purported debt which finances the purchase is illusory. Estate of Franklin v. Commissioner,544 F.2d 1045, 1049 (9th Cir. 1976), *82 affg. 64 T.C. 752 (1975). Without underlying indebtedness there can be no deduction for interest. Perrett v. Commissioner,74 T.C. 111 (1980). As discussed above, we have determined that petitioners were personally liable for $ 25,000, comprised of the $ 10,000 down payment, the seven annual payments of $ 2,000 and the conversion fee of $ 1,000. Thus, petitioners were fully liable for only $ 15,000, payable over 7 years. These payments are described as interest by the terms of the promissory note. However, if this were the actual case, petitioners would be paying a total of $ 15,000 interest on an underlying debt of $ 11,000. Rather, we find that these payments, although unconditionally and fixed, are a combination of principal and interest allocable at the Federal rate of interest. To the extent that there is recourse liability there is indebtedness which can support interest deductions, notwithstanding the lack of profit motive. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983). We shall leave the calculation of the precise discounted principal and the *83 annual interest thereon, calculated at the applicable Federal rate, to the parties on their Rule 155 computation. Additions to Tax Due to Negligence Under Section 6653(a)
The next question for our consideration is whether petitioners Fishel, Oleynik and Janklow are liable for additions to tax for negligence under section 6653(a). The additions were determined for the years 1978 and 1979 for Fishel, the years 1978 through 1982 for Oleynik and the years 1977 and 1979 for Janklow. Section 6653(a) provides for an addition to tax of 5 percent if any part of the underpayment is due to negligence or intentional disregard of rules or regulations. [36] With respect to section 6653(a), negligence has been defined as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner,380 F.2d 499, 506 (5th Cir. 1967). Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners bear the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757 (1972). *84 Oleynik, Fishel and Janklow took deductions and credits that were clearly not allowable. They exhibited careless and unbusinesslike behavior with respect to the Del Vida investments. Although they relied on the wisdom and counsel of their financial advisors, they knew that these advisors were inexperienced and nearly as uninformed as they were themselves. Such reliance cannot be considered prudent. Perrett v. Commissioner, supra.
Since petitioners failed to show that their underpayments of tax were not due to negligence or intentional disregard of the law, we sustain respondent's determination of section 6653(a)(1) additions to tax. Addition to Tax Under Section 6653(a)(2)
Petitioner Oleynik is further charged with an addition to tax under section 6653(a)(2) for the years 1981 and 1982. Section 6653(a)(2) allows an addition to tax in the amount of 50 percent of the interest payable under section 6601 with respect to the portion of underpayment attributable to negligent or intentional disregard of the rules and regulations. The burden of proof for this issue rests with petitioner. Benningfield v. Commissioner,81 T.C. 408 (1983). *85 Oleynik failed to meet this burden of proof. Therefore we sustain respondent's determination that Oleynik took depreciation deductions and investment tax credits with negligent or intentional disregard of the rules and regulations. Additional Interest Under Section 6621(c)
Pursuant to our Order, dated September 3, 1985, respondent was allowed to amend his answer to request a determination of substantial underpayments attributable to tax motivated transactions, with respect to all petitioners, except the Putmans. Because the claim was first asserted in the Amendment to Answer, respondent bears the burden of proof. Parker v. Commissioner,86 T.C. 547, 566 (1986). Under section 6621(c) additional interest on such substantial underpayments is assessed at a rate of 120 percent of the usual rate. The section 6621(c) interest is not assessed on any additions to tax but only on the actual underpayment in tax. In order to apply the additional interest we must first determine if there has been a substantial underpayment attributable to a tax motivated transaction. A substantial underpayment is the difference between the tax owed without taking into account the *86 tax advantaged items flowing from the tax motivated transaction and the tax owed after these items have been added back. Section 6621(c)(2) requires that this difference exceed $ 1,000. Because we do not know what the entire deficiencies will be, we cannot say whether the differences would exceed $ 1,000 for each petitioner. Assuming that future computations will show that the underpayments exceed $ 1,000 a piece, the issue for our consideration is whether each underpayment was attributable to a tax motivated transaction. Section 6621(c) lists certain underpayments considered attributable to tax motivated transactions. We determined above that the Del Vida video tapes constituted a tax shelter which was motivated primarily by tax avoidance and which was bereft of economic meaning. Section 6621(c)(3)(A)(v) includes within the definition of a tax motivated transaction "any sham or fraudulent transaction." The meaning of the term, sham, under section 6621(c), has been interpreted to mean a transaction which has no economic substance. Patin v. Commissioner,88 T.C. 1086, 1125 (1987). *87 We determined above that the Del Vida investment posed no realistic possibility of generating a profit and thus did not have economic substance. Thus, any underpayments attributable to the Del Vida investment were attributable to a tax motivated transaction. Furthermore, respondent has shown that the Del Vida video tapes were overvalued by at least 150 percent, as described in section 6659(c). Although the Del Vida video tapes had a stated purchase price of $ 100,000 they had an actual fair market value between $ 1,000 and $ 4,000, an overvaluation of much more than 150 percent. This overvalued price was the adjusted basis petitioners used in computing their deductions and credits. It was the basis for the illusory promissory note on which they took interest deductions. All of the depreciation deductions, interest deductions and investment tax credits taken by petitioners on the basis of the overvaluation are thus underpayments attributable to a tax motivated transaction. The Del Vida video tapes represent just the sort of arrangement which deserves the application of additional interest under section 6621(c). As to petitioners Janklow, the deficiency relates to two similar issues. *88 As to the Del Vida issue, we find that petitioner Janklow is liable for the additional interest imposed by section 6621(c). As to the Pro Video issues, we note that petitioner Janklow has agreed to be bound by our recent opinion in Baigent v. Commissioner,T.C. Memo. 1987-314 and in that case we imposed additional interest under section 6621(c). Therefore, all of the deficiency determined against petitioner Janklow, regardless of the source, is considered to flow from a tax motivated transaction within the meaning of section 6621(c). Conclusion
In sum, after considering all the evidence presented in this case, we conclude that petitioners have failed to meet their burden of proving that their purchases of the Del Vida video tapes were motivated by profit objective or reflected economic substance. We hold that petitioners' depreciation deductions, investment tax credits and deductions related to management fees were improperly taken. Furthermore, we determined that only $ 15,000 of each of the promissory notes signed by petitioners to finance their purchases of the Del Vida video tapes constituted full recourse debt. Some portion of that full recourse *89 debt, to be computed by the parties pursuant to Rule 155 and under the applicable Federal interest rate, is deductible interest while the remainder constitutes nondeductible principal. We have further determined that petitioners Janklow, Oleynik and Fishel are liable for an addition to tax under section 6653(a) for negligent underpayment of tax. Petitioners Oleynik are also liable for additions to tax under section 6653(a)(2). Finally, whatever deficiency is determined after the parties complete their computations under Rule 155 will be deemed to have resulted from a tax motivated transaction within the meaning of section 6621(c). To the extent that this results in an underpayment of tax exceeding $ 1,000 petitioners will be liable for the additional interest prescribed by section 6621(c). Decisions will be entered under Rule 155.
APPENDIX A
Taxable
Additions to Tax
Sec.
Petitioner
Year
Deficiency
Sec. 6653(a)
Sec. 6653(a)(2)
6621(c)
(Years)
Alvin A. and
1977
$ 5,300.00 $ 265.00
Phyllis S. Janklow
1979
[37] 7,287.00
364.00
1979
Charles and
1978
11,488.00
574.00
1978
Agnes Fishel
1979
25,886.00
1,294.00
1979
John A and Irene
1978
10,000.00
1978
Struiksma
1979
6,506.00
1979
1980
6,058.00
William and
1978
5,030.00
Marily Struiksma
1979
1,702.00
1979
1980
3,424.00
1980
1981
3,474.00
1981
Roman J. and
1978
16,266.00
813.00
50% of the
1978
Lorraine A. Oleynik
1979
2,575.00
128.75
interest
1979
1980
4,495.00
407.15
due on
1980
1981
4,329.00
216.45
$ 4,329.00
1981
1982
8,890.24
444.51
and $ 8,890.24
1982
Forrest R. and
Carol E. Whitcomb
1978
18,125.00
1978
Robert D. and
1978
5,000.00
Patricia A.
1979
10,174.00
1979
Struiksma
1980
2,309.00
1980
Marvin and
1978
4,976.00
Carol Struiksma
1979
1,335.00
1979
1980
223.00
William R. and
Mary J. Putman
1978
4,784.00
*90 APPENDIX B
Petitioners
Year
Deduction Disallowed
Amount
John and Irene Struiksma
1978
Investment Credit
$ 10,000
1979
Depreciation
28,571
Interest
2,000
1980
Depreciation
20,408
Interest
2,000
Management Fee
100
William and Marilyn Struiksma
1978
Investment Credit
5,000
1979
Depreciation
14,286
Interest
1,000
1980
Depreciation
10,204
Interest
1,000
1981
Depreciation
7,289
Interest
1,000
Marvin and Carol Struiksma
1978
Investment Credit
5,000
1979
Depreciation
14,286
Interest
1,000
Management Fee
25
1980
Depreciation
10,204
Interest
1,000
Management Fee
50
Robert and Patricia Struiksma
1978
Investment Credit
5,000
1979
Depreciation
14,285
Interest
1,000
1980
Depreciation
10,204
Interest
1,000
Management Fee
50
Forrest and Carol Whitcomb
1978
Depreciation
11,000
Interest
5,250
Investment Credit
10,000
Charles and Agnes Fishel
1978
Investment Credit
5,000
Depreciation
14,000
Interest
875
1979
Investment Credit
10,000
Depreciation
9,000
Interest
2,000
Alvin and Phyllis Janklow
1977
Depreciation
2,000
Investment Credit
5,000
Roman and Lorraine Oleynik
1978
Depreciation
10,000
Interest
2,333
Agent and Misc. Fees
50
Investment Credit
10,000
1979
Depreciation
11,613
Interest
2,000
1980
Depreciation
11,613
Interest
2,000
1981
Depreciation
11,613
Interest
500
Misc. Fees
200
1982
Depreciation
11,613
William and Mary J. Putman
1978
Depreciation
7,833
Management Fee
25
Investment Credit
5,000
*91 Footnotes
1. Cases of the following petitioners are consolidated herewith: Joseph Herpin, Roman and Lorraine Oleynik, William and Mary Putman, Marvin and Carol Struiksma, Robert and Patricia Struiksma, William and Marilyn Struiksma, Forrest and Carol Whitcomb, docket No. 11759-82; Charles and Agnes Fishel, John Rogers, docket No. 4189-83; John A. and Irene Struiksma, William and Marilyn Struiksma, docket No. 9687-83; Joseph E. Herpin, Alvin A. and Phyllis Janklow, docket No. 18420-83; Joseph E. and Lue J. Herpin and Roman J. and Lorraine Oleynik, docket No. 13267-84. The consolidated cases are set forth in Appendix A which lists petitioners by name, the years involved and the deficiencies and additions to tax for each year. The deductions, losses and credits claimed by petitioners with respect to their purchases of the video tapes are set forth in Appendix B. ↩
2. Docket No. 18420-83, with respect to petitioners Janklow, involves two distinct issues. During the taxable years at issue petitioner Janklow had invested in video tapes from two sources, Del Vida and Pro Video. Both issues together are the foundation for the notice of deficiency and the petition. In so far as the deficiency relates to the Del Vida issue, petitioner Janklow is subject to this opinion. In so far as the deficiency relates to the outcome in our recent case of Baigent v. Commissioner,T.C. Memo. 1987-314↩. Petitioner Herpin settled all issues with respondent prior to trial. Appropriate orders will be issued. 3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. Appendix A lists petitioners and the taxable years in respect to which respondent determined deficiencies in income and additions to tax, including an addition to tax under section 6621(c)↩. 5. Respondent conceded that petitioner Janklow was entitled to deduct certain expenses as an artist in 1979 in the amount of $ 2,498. ↩
6. Subsection (d) of section 6621↩ was redesignated as subsection (c) by Pub.L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use this reference to the Internal Revenue Code as redesignated and amended. 7. Only petitioners Alvin and Phyllis Janklow (herein referred to as Janklow or the Janklows) purchased a video tape in 1977. All the other petitioners purchased the video tapes in 1978. ↩
8. With the exception of Jane Putman, only petitioner-husbands were actively involved in purchasing the Del Vida video tapes. Therefore, all references to petitioners in this opinion will refer to petitioner-husbands only. ↩
9. The guests on the 13 episodes of "Music Country" were Dorsey Brunette, Hank Williams, Jr., Danny Welton, the Hager Brothers, Mayf Nutter, Stella Parton, Sheb Wooley, Vicky Fletcher, Mickey Gilley, Pete Wilcox, Gunilla Hutton, Susie Alanson, Molly Bee, and Hank Thompson. ↩
10. Sari Mitchell's guests included Patricia Neal, George Jessel, Ann Jefferies, Marty Allen, Bill Dana, Dick Bass, Corine Calvert, Mr. Blackwell, Mrs. America, Aldo Ray, Robert Walker, Jr., and Mamie Van Doren. ↩
11. The guests on "Hollywood Cabaret" were Herb Jeffries, Roberta Sherwood, Rosemary Clooney, Marty Allen, Dennis Day, Marilyn King, Phyllis Diller, Jackie Vernon, Pat Butram, and Jessie White. ↩
12. All the financial advisors testified except Doherty, Whitcomb's advisor. ↩
13. Both Putman and Whitcomb were told that the video tape was worth more than $ 100,000 at the time of purchase. Peterson informed his clients Fishel and Oleynik that the video tape would produce revenues of approximately $ 175,000 over the next 7 or 8 years. Janklow was told that the video tape would be money-making venture while the Struiksmas were informed that each video tape would generate gross receipts in the approximate amount of $ 200,000 over the next 7 years. ↩
14. Rev. Rul. 77-398, 1977-2 C.B. 179↩. 15. Fishel, a tax attorney, was not informed because Peterson felt it was unnecessary. ↩
16. Most of petitioners still had not viewed their video tapes as of the trial date. ↩
17. The names in parentheses are those of co-owners of the video tapes who are not petitioners before us here. M. Struiksma and W. Struiksma are co-owners and both are petitioners. ↩
18. The payments were divided as follows: ↩
Petitioner
Principal
Prepaid Interest
Janklow & (Brownlee)
$ 8,000
$ 2,000
Whitcomb 4,750  5,250 Putman & (Eichinger) 4,750 5,250 Oleynik 7,667 2,333 Fishel 8,250 1,750 W. Struiksma & M. Struiksma 9.417 583   J. Struiksma 9.417 583   R. Struiksma & (Vanderzwaag) 9,417 583   19. The amounts due were as follows: ↩
Petitioner
Date
Amount of Note
Janklow & (Brownlee)
Dec. 14, 1977
$ 92,000
Whitcomb
April 1, 1978
95,250  Putman & (Eichinger)
April 28, 1978
95,250  Oleynik
Sept. 19, 1978
92,333  Fishel
Oct. 31, 1978
91,750  M. Struiksma & W. Struiksma
Dec. 22, 1978
90,583  J. Struiksma
Dec. 22, 1978
90,583  R. Struiksma & (Vanderzwaag)
Dec. 22, 1978
90,583  20. The note signed by Fishel purported to be full recourse for 10 years. During the last three years the minimum interest due would be $ 1,000 per year. ↩
21. According to the terms of the promissory notes signed by both Janklow and Whitcomb, the distributor was required to have gross receipts in excess of $ 2,000,000 to satisfy the condition whch would convert the note to nonrecourse. ↩
22. Janklow's promissory note specified that 1,000,000 VCR's would have to be sold to satisfy the condition which would convert the note to nonrecourse. ↩
23. Neither the note nor the production service agreement specified a journal or other means for determining how many VCR's had been sold in the United States. According to the Electronic Industries Association of Japan's study more than 1,500,000 VCR's had been exported from Japan by 1978. ↩
24. In the copies of the assignment of copyright submitted to the Court Del Vida had not bothered to fill in the name of the specific video taped program whose copyright was being transferred. ↩
25. Petitioner Putman did not sign a production service agreement although his co-owner, Evelyn Eichinger, did. ↩
26. None of petitioners actually received any of this money although most of them were aware of the licensing arrangement. ↩
27. Two of the Del Vida video tapes sold to KOUS-TV were never aired. ↩
28. These factors are (1) manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; (9) elements of personal pleasure of recreation. ↩
29. Hawkins v. Commissioner,T.C. Memo. 1987-733↩, p.10. 30. In the case before us the result under the section 183 subjective intent analysis would be the same as under the Rose↩ objective economic substance analysis. 31. In Abramson v. Commissioner,T.C. Memo, 1987-276↩, we considered a taxpayer whose generic tax shelter involved a film. The taxpayer advertised his film in the paper and protested his distribution company's lack of success. Those efforts, greater than those exhibited by petioners before us, were insufficient to establish the taxpayer's desire to make money on his film. 32. Petitioner Janklow was also a petitioner in the Baigent↩ case. 33. The figure of $ 52,500 represents Trentacosta's estimate of foreign television sales in the amount of $ 500 per tape over seven years. Trentacosta multiplied this figure of $ 3,500 by 15 allegedly to demonstrate the extent of total foreign television income from the entire series. We have no indication as to why this mistake was made. The correct figure would be $ 3,500, not $ 52,500, resulting in gross projected income for a 7-year period of $ 199,300 and a net projected income in the amount $ 131,045.↩
34. According to respondent's expert witness, A. Frank Reel, "That Girl," a highly popular television program, grossed only $ 60,000 in syndication. Trentacosta would have us believe that a Del Vida program would gross approximately four times as much, or $ 248,300. This is optimism run amok. ↩
35. 1,000,000 as to Janklow. See footnote 22 above. ↩
36. Prior to 1981 section 6653(a) read substantially as follows, with certain minor amendments during the years in issue: (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income, Gift, or Windfall Profit Taxes. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B (relating to income taxes and gift taxes), or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. Section 6653(a) was amended by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 172, to read as follows, applicable to taxes the last date of payment of which is after December 31, 1981: (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income, Gift, or Windfall Profit Taxes. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by chapter 12 of subtitle B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) Additional amount for portion attributable to negligence, etc. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax. ↩
37. The statutory notice of deficiency sent to petitioners Janklow with respect to the taxable year 1979 includes in one deficiency, a deficiency related to the investment at issue here as well as an investment not at issue. Separating the two deficiencies will be a matter for the parties' computations under Rule 155. ↩