JAMES M. GERHART AND PHYLLIS GERHART, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gerhart v. Commissioner
Docket Nos. 6299-82, 20551-85, 37767-85
United States Tax Court
T.C. Memo 1991-35; 1991 Tax Ct. Memo LEXIS 55; 61 T.C.M. (CCH) 1745; T.C.M. (RIA) 91035; January 29, 1991, Filed *55 Decision will be entered under Rule 155. James H. Vernon, for the petitioners. Steven M. Roth, for the respondent. BUCKLEY, Special Trial Judge. BUCKLEY
MEMORANDUM FINDINGS OF FACT AND OPINION This case was heard pursuant to section 7443A(b) and Rules 180 et seq. [1] In a notice of deficiency dated December 31, 1981, respondent determined the following deficiencies in petitioners' Federal income tax: Year Deficiency
1974
$ 3,097
1975
5,941
1977
6,598
1978
3,899
1979
4,017
1980
3,518
By separate notice of deficiency dated April 1, 1985, respondent also determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to tax under
Sec.
Sec.
Sec.
Year
Deficiency
6653(a) (1)
6653(a) (2)
6659
1981
$ 5,011
$ 251
*
$ 1,503
1982
6,102
305
*
1,831
In a third notice of deficiency dated August 15, 1985, respondent further determined a deficiency of $ 3,017 in petitioners' *56 1983 Federal income tax. In addition, respondent determined that interest on the deficiencies for tax years 1981, 1982, and 1983 is to be computed under section 6621(c) (formerly section 6621(d)). Timely petitions to this Court were made respecting each of the three notices of deficiency issued by respondent. Because the factual matters and legal issues raised in each petition are in all material respects the same, these cases were consolidated for trial pursuant to Rule 141(a). Respondent concedes the investment tax credit claimed by petitioners in 1977 for the purchase of a boat used in petitioner husband's excursion boat business. He further concedes the amount of the unused portions of this credit carried back to 1974 and 1975. In his December 31, 1981, notice of deficiency, respondent disallowed medical *57 expense deductions of $ 126, $ 211, and $ 502 claimed by petitioners in 1977, 1978, and 1979, respectively. Petitioners have not contested these disallowances and did not raise the issue in their petition. We therefore sustain respondent on this issue. The issues remaining for resolution involve petitioners' purchase of a videotape episode of the series "Coping." These issues are: (1) Whether petitioners invested in the videotape with an actual and honest profit objective, (2) whether the promissory note petitioner husband executed in partial consideration for the videotape purchase constituted a bona fide indebtedness, (3) whether petitioners are liable for additions to their 1981 and 1982 tax under sections 6653(a)(1) and (a)(2) and section 6659, and (4) whether any portion of the deficiencies determined by respondent for 1981, 1982, and 1983 constitute a substantial underpayment attributable to a tax motivated transaction within the meaning of section 6621(c). Our decision on these issues dictates to what extent, if at all, petitioners are entitled to the credit and deduction amounts they claimed in connection with their videotape investment. FINDINGS OF FACT Some of the *58 facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners, James M. and Phyllis Gerhart, are husband and wife and filed joint Federal income tax returns for each of the years in issue. They resided in Stockton, California, at the time they filed each of the petitions in this case. Petitioners acquired the 52nd videotape episode of a series entitled "Coping." None of the episodes of this series had been licensed for distribution. Petitioner husband is knowledgeable of the details of the videotape investment activity, and hereafter reference to petitioner in the singular denotes James M. Gerhart. The Videotape Production and Distribution Industry
The primary market targeted for distribution of videotape productions is that of television. This market comprises both the cable and conventional television markets. Cable television, however, has never been a viable market for the distribution of videotape episodes such as the one acquired by petitioners in this case. In 1977, the year in which petitioners acquired their videotape, pay cable companies aired only feature motion picture productions, *59 and while today they also frequently air videotape programs, these are produced in-house. In 1982 or 1983, pay cable expanded to include basic cable companies, but these companies tend only to broadcast older motion pictures and reruns of old television shows, and therefore they did not create a new market for videotape productions. The conventional television market is further divisible into network television and syndicated television. In the highly competitive network television market, a videotape series begins with a concept or idea broached by the producer. If the network sees promise in the concept, it finances the production of a pilot episode. The pilot episode is utilized to test audience reaction, and if favorable, additional episodes of a series are produced. The videotape series of which petitioners' episode was a part was not of sufficient quality to be shown by network television. In a similar vein, producers who seek to license television rights through syndication typically test the market before producing an entire series. A small number of episodes (frequently only one) of a contemplated series are circulated to potentially interested syndicated television *60 stations in major cities. If a sufficient number of stations commit to the purchase of licensing rights, further production and distribution is deemed warranted and carried out. Unlike network television where the network finances the production and bears the risk of loss, in syndication the financial risk is borne by the producer. Members of the industry do not normally incur the cost of producing an entire videotape series without first determining that there will be a sufficient market for it. It is not uncommon for videotape producers to engage an experienced distributor to search for potential licensees. The distributor handles all aspects of getting the production out to the marketplace. The business of videotape distribution is sophisticated and expensive. A distribution fee ranging from 20 to 60 percent of the gross receipts generated from the sale of rights to show the productions is typically charged. Gross receipts refer to the amount of revenue collected by the distributor before taking out his costs of distribution. These costs include his basic expenses of physical duplication and transportation of videotapes, as well as the costs of "residuals;" royalty amounts *61 that must be paid to various organizations such as the American Federation of Television and Radio Artists, Screen Actors Guild, and American Federation of Musicians. Background of Petitioner's Investment Activities
Petitioner has a history of venturing into new business and investment activities with little or no experience. Some of these have proved successful while others have not. In about 1965, petitioner and several associates formed General Radio Isotope Products (General Radio), a risky manufacturing venture which began as a small-time garage operation. Petitioner had no prior knowledge of or experience in the business engaged in by General Radio. Nonetheless, the business achieved financial success and its eventual sale in 1975 netted petitioner a tidy profit. Because of General Radio's success, petitioner found himself in a position to make investments ranging from low risk to highly speculative. In about 1973 or 1974, petitioner participated in forming another company named Alamo Industries. Alamo Industries employed a metal extrusion process to manufacture uranium bullets. The company rested its hopes of success on securing a large government contract, but *62 was unable to do so and was never profitable. Petitioner also invested in the creation of a company that produced shoplifter detection devices for retailers. Through radioactive tagging of inventory, the devices were designed to alert retailers when merchandise was being removed by persons who had not paid for it. Petitioner had no prior experience in this business and it too proved unsuccessful. At or about the time petitioner sold his interest in General Radio, he and his wife acquired an office building complex in San Mateo, California. A property management company was hired to handle the day-to-day operations and petitioner oversaw the activity. He had not previously engaged in this type of business and how successful the investment was is not known. In 1977, petitioner purchased a 62-foot, 90-passenger boat and entered into the excursion boat business. Through the time of trial, this was petitioner's principal business activity. Petitioner had no previous experience in the excursion boat business. Yet, in his words, the business has turned out "very well." In addition, petitioner has made numerous investments in the stock market and in limited partnerships. He describes *63 himself as somewhat of a gambler willing to take large risks for a potentially large payoff. Petitioner's Videotape Investment Activity
In 1977 petitioner invested in the videotape activity that is the subject of this case. Mr. Rod Davidson, an investment counselor whom petitioner had known for a number of years, approached petitioner in the latter part of 1977 and suggested the purchase of a videotape episode from Metro Productions, Inc. (hereafter Metro). The tax consequences of such an investment was an integral part of their discussions. Petitioner knew Mr. Davidson to be an experienced and reputable advisor on investments, but before investing, he consulted with his accountant regarding the tax implications and financial impact of the investment. He also discussed the legal aspects of the proposed contractual arrangement with his lawyer. In addition, petitioner reviewed promotional materials furnished by a representative of Metro. These materials highlighted potential tax advantages of investing in a Metro videotape production. A sales brochure referred in several places to the tax benefits that might be achieved, and accompanying charts projected amounts of specific *64 tax savings. In addition, included in the materials was a letter issued to Metro by the law firm of Bushkin, Kopelson, Gaims & Gaims, providing the firm's legal opinion that Metro's videotape investment offerings qualify for favorable tax treatment. Petitioner possessed no prior knowledge of the videotape production industry, and before investing, made no attempt to learn of it or to investigate Metro's history and success rate in the industry. Based on his discussions with Metro representatives, review of its promotional materials, and consultation with his accountant and attorney, petitioner decided to acquire a videotape episode of a series entitled "Coping." He did not negotiate the purchase price, did not inquire into the number of episodes in the series, nor did he then, or at any subsequent time, view any of the other episodes in the series. On December 20, 1977, petitioner and Metro entered into a written production service agreement (hereafter the agreement) wherein, in exchange for the payment of $ 90,000, Metro agreed to transfer ownership of the videotape episode to petitioner. In accordance with the agreement, petitioner paid $ 7,000 down and executed an $ 83,000 *65 promissory note (hereafter the note) for the balance of the purchase price. A certificate of registration for claim to copyright for episode number 52 of the series "Coping" was issued in petitioner's name by the U.S. Copyright Office on December 29, 1977. Under the terms of the note, interest purportedly accrued on the unpaid balance at a rate of 7 percent per annum. The agreement gave Metro a security interest in the videotape. The record does not reflect whether Metro ever perfected its security interest by filing the financing statement signed by petitioner. The note purported to be a full-recourse note over an initial term of 5 years after which the maker had the option to renew the note for an additional 5 years and to convert it to a nonrecourse note by paying $ 1,000 towards principal. The note required minimum annual payments of $ 2,000 by January 10th of each year during the initial 5-year term beginning with 1978. These payments were to be applied to accrued but unpaid interest. Additional payments on the note during the initial 5-year term were required only if petitioner realized net receipts from distribution of the videotape. At the end of the initial 5-year *66 term, the principal balance and unpaid accrued interest were due and payable unless the note was renewed. During the 5-year renewal term, no minimum payments were required; a percentage of net receipts generated by the videotape, if any, was to be applied to repayment of the note with unpaid interest and principal payable at the end of the term. Despite the considerable size of the ostensible loan, Metro never sought information necessary to evaluate petitioner's credit risk. Petitioner made the $ 2,000 annual interest payments required by the note for each of the years 1978 through 1982. At the end of the initial 5-year term, he exercised his option to renew the note for another 5 years. Though not required, petitioner made additional annual interest payments of $ 2,000 by January 10th of 1983 and 1984. On January 5, 1985, petitioner exercised the option to convert the note to nonrecourse by making a $ 1,000 payment towards the unpaid principal balance. Thereafter, petitioner made no further payments on the note. Petitioner believed that his conversion of the note to nonrecourse status constituted a relinquishment of his ownership rights in the videotape. There is no evidence *67 in the record suggesting Metro ever initiated foreclosure proceedings pursuant to its security interest. Concurrent with execution of the production services agreement and in compliance with a requirement in the agreement that petitioner contact a management consulting firm within 14 days to assist him with distribution of the videotape, petitioner entered into a contract with Investors Management Services, Inc. (hereafter IMS). Metro recommended that petitioner utilize IMS to manage distribution of the videotape. Petitioner had no personal knowledge of IMS prior to entering this agreement and made no effort to investigate the company's reputation or qualifications. Under the contract, petitioner agreed to pay IMS a $ 200 retainer fee and 6 percent of gross receipts received from the distribution and/or exploitation of the videotape. IMS had exclusive rights to negotiate for the tape's distribution and/or exploitation and was to receive and account to petitioner for gross receipts therefrom. IMS continued as distribution manager throughout the 7-year period petitioner engaged in this activity. Petitioner devoted less than 5 percent of his time to the videotape investment activity. *68 His involvement was limited to reviewing quarterly and annual accounting statements and bi-monthly publications issued by IMS. Despite continued unprofitability of the videotape, petitioner at no time sought to replace IMS as distribution manager. In the year of the videotape's acquisition (1977), petitioners claimed an investment tax credit in the amount of $ 9,000 on their Federal income tax return -- calculated at 10 percent of the videotape's purported $ 90,000 cost in accordance with section 46, i.e., $ 7,000 down plus the $ 83,000 note -- and he claimed, for each of the years in issue, accelerated depreciation of the cost basis using an assigned useful life of 7 years. Petitioner also claimed as deductions, the expenses incurred for the videotape's distribution and the interest payments made on the note. As the videotape investment generated negligible receipts, losses from the activity were reflected for each of the years in issue. Respondent disallowed in full each of the credit and deduction items claimed by petitioners in connection with the videotape investment activity. OPINION Petitioner has the burden of proof on each of the issues raised in this case. *69 Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933); Rule 142(a). As a matter of convenience, we address each issue separately. Issue 1. Existence of Actual and Honest Profit Objective
Petitioners are entitled to the investment tax credit and other deductions respecting the videotape investment only if the purchase of the videotape and related expenses were made in connection with a trade or business or for the production of income. See sections 38 and 48, 162 and 167, and 212.
Petitioners have not asserted they were engaged in the trade or business of producing and distributing videotape productions; and indeed they could not have argued that point seriously. Whether the investment in the videotape was made for the production of income hinges upon whether petitioner had, apart from the desire to receive anticipated tax benefits, an actual and honest profit objective. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). An expectation of profit need not be reasonable, but the objective for profit must be actual and honest. Fox v. Commissioner, 80 T.C. 972, 1006 (1983),16 affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *70 Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984). Respondent contends that petitioners' investment is a "generic tax shelter" devoid of economic substance and that petitioners were motivated to purchase the videotape, not by an objective of profit, but by the tax avoidance attributes touted by the investment's promoters. Petitioners maintain that albeit their investment was highly speculative, they entered into it with the actual and honest objective of making a profit. In resolving this question, we note our decision in Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). There we applied an objective analysis to determine whether an investment activity lacked economic substance and was therefore without legitimate business purpose, i.e., without an actual and honest profit *71 objective. Embodied within our Rose opinion are the section 183 concepts for determining whether a taxpayer activity was not engaged in for profit. In making such a determination, we have generally looked at the surrounding facts and circumstances and applied the nine factors enumerated in the regulations promulgated under section 183. [2] See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976). In Rose v. Commissioner, supra at 412-415, we held that where taxpayer investments possess certain characteristics of tax motivation it is more appropriate to apply an objective test; such a test being, inter alia, a more precise standard of review and yielding more consistent and predictable results. We identified the following characteristics to be indicative of tax motivation: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult *72 to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance.
*73 We referred to investments with these characteristics as generic tax shelters. Rose v. Commissioner, supra at 412-413. Petitioners' investment in the videotape episode of the series entitled "Coping" possesses each of the above characteristics, and we find that it was a generic tax shelter as we contemplated in Rose v. Commissioner, supra. Upon review of our decision in Rose, the Sixth Circuit chose not to accept our generic tax shelter test "because it does not aid us in the basic inquiry as to whether the transaction had any practicable economic effect other than the creation of income tax losses." Rose v. Commissioner, 868 F.2d at 853. The Sixth Circuit went on to state, however we characterized the test, "the essential inquiry is whether the transaction had any practicable economic effect other than the creation of economic tax losses." Rose v. Commissioner, 868 F.2d at 854. Under the facts of this case, the outcome is the same when we apply the section 183 nine-factor analysis. The next step in our analysis is to examine the dealings between petitioner and the videotape producer, *74 the relationship between the sales price and fair market value of the videotape, and the structure of the financing. 1. Dealings Between Petitioner and Metro
Aspects of the investment arrangement were atypical of the way videotape productions are marketed in the industry. For example, a large number of episodes of the series were produced prior to testing the marketplace, and the distribution fee charged by IMS did not approach the size of the fees commanded by other film and videotape distributors in the industry. It is as though none of the participants in the arrangement truly anticipated the videotape production to be profitable. Neither petitioner nor any of the independent advisors he relied upon had any experience in or knowledge of the videotape production and distribution industry. Yet petitioner agreed to invest $ 90,000 in a videotape episode produced by Metro without investigating the company's qualifications or history of success or lack thereof in the industry. Furthermore, despite the fact the investment's success was contingent upon the success of the videotape series as a whole, petitioner never expressed an interest in viewing any of the other episodes *75 in the series or in knowing who the other investors were. The promotional materials provided to petitioner to encourage his investment contain very little about the potential profitability of the videotape and contain no revenue forecasts. To the contrary, the materials explain the high degree of risk involved in videotape productions while emphasizing the potential tax benefits of the investment. In fact, charts indicate the amount of anticipated sheltered income that can be achieved through deductions arising out of the videotape acquisition and a legal opinion is attached indicating the tax advantages. The true nature of the transaction as a tax avoidance vehicle is also evident from petitioner's ready acceptance of Metro's proposed sale price and other terms and conditions without objection or negotiation. Petitioner showed an equal amount of unconcern about and uninvolvement in the selection of a distribution manager for his videotape. He acquiesced in Metro's recommendation of IMS with as little inquiry about that company as he had made with respect to Metro itself. Moreover, despite the poor results obtained by IMS in its attempted distribution of the videotape, petitioner *76 took no action, but rather was content to take advantage of the tax benefits. As we observed of the taxpayers in a case involving a nearly identical set of facts, petitioner in this case also "displayed extraordinary passivity and trustfulness in relying on the advice of [his] financial counselors" and "manifested inattention, nonchalance and ignorance throughout the entire transaction." Janklow v. Commissioner, T.C. Memo 1988-46, 1988 Tax Ct. Memo LEXIS 40, 55 T.C.M. 69, 75, 1988 T.C. Memo 46 and 76, 57 P-H Memo T.C. par. 88,046 at 268 and 269. We conclude petitioner's dealings with Metro and IMS are objective indications that he lacked the requisite profit objective. 2. Relationship Between Sales Price and Fair Market Value
Petitioner steadfastly maintains that his purchase of the videotape was at arm's length, and the price paid was the videotape's fair market value. He argues that the price paid includes his $ 7,000 cash down payment and the entire $ 83,000 promissory note given in exchange. We find this claim dubious at best. As discussed above, the indications are that petitioner bargained for the tax benefits and not for the real value of the asset acquired. Moreover, *77 regardless of the form the transaction took, in substance the value given by petitioner included only his $ 7,000 down payment, the seven annual interest payments of $ 2,000, and the $ 1,000 payment made to convert the note to nonrecourse -- a total of $ 22,000. Consequently, we do not accept the assertion that the sale was made at arm's length for $ 90,000. At trial, petitioners made no further showing on the videotape's fair market value. Respondent offered the written report and testimony of an expert witness (Mr. A. Frank Reel) who has appeared in this Court on numerous occasions testifying on the value of videotape productions. His credentials in the industry are undisputed. Nevertheless, petitioners lodged an objection to the admission of this evidence on the basis that the expert had not viewed the subject videotape episode. Respondent conceded that Mr. Reel had not seen the episode purchased by petitioners, but argued that since Mr. Reel had viewed 8 of the 90 or so episodes produced for the series, his opinion as to the value of the series as a whole was competent and relevant. Respondent further pointed out that attempts were made to obtain the videotape from petitioner *78 both informally and via formal subpoena, but in response respondent was advised of its unavailability. We admitted the evidence over petitioners' objections, since the inability to review the specific videotape was the result of petitioners' being unable to supply it. We are impressed with Mr. Reel's qualifications as an expert and rely upon his opinion. See Johnson v. Commissioner, 85 T.C. 469, 477 (1985). Our findings of fact with respect to the videotape production industry reflect the knowledge he imparted. We are convinced that as a single episode the videotape had essentially no value; its value therefore was dependent upon the value of the series as a whole. We find that the fair market value assignable to petitioners' 1977 videotape purchase was, as appraised by Mr. Reel, between $ 2,700 and $ 3,600. This large disparity between purported sales price and fair market value is further indication that the entire transaction lacked economic substance. 3. Structure of the Financing
Here we examine the nature of the financing arrangement to determine the likelihood that Metro and petitioner ever intended for the underlying debt to be repaid. Under *79 the terms of the note executed by petitioner, Metro had full recourse against petitioner in the event of default during the first 5 years, but at the conclusion of that time petitioner had the option, upon payment of $ 1,000, to convert the note to a nonrecourse debt instrument. Upon exercise of the option, Metro's only protection in the event of default would be to exercise its security interest in the videotape collateral -- the value of which, as we have already seen, pales in comparison to the purported amount of debt. There was no requirement that any portion of the principal amount of the debt be repaid during the first 5 years unless there were profits from the videotape's exploitation. Clearly, petitioner and Metro knew there would be no default in the first 5 years; for it was to petitioner's advantage to pay the required interest so as to receive the related tax benefits, i.e., deduction of the interest payments and depreciation of the inflated basis in the videotape. Once the tax benefits were exhausted, petitioner was able to extricate himself from personal liability on the note by merely paying $ 1,000. Metro benefited from this arrangement also since it received *80 total cash payments far in excess of the fair market value of the asset sold. It also had the right to repossess the videotape upon petitioner's eventual default on the note. In economic reality then, petitioner was never responsible for repaying the entire debt, and both he and Metro were well aware of it. Additional evidence of this is the casualness with which Metro extended the $ 83,000 loan to petitioner. Metro made no effort to verify the credit history of petitioner or to determine his financial ability to repay the amount of the note. The explanation for Metro's failure to exercise such commercial diligence is that from the outset it never intended to be fully repaid. Consistent with our decisions in Janklow v. Commissioner, supra; Rose v. Commissioner, supra; Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); and Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986), we look through the form of the debt instrument to the actual substance of the loan transaction and *81 conclude that petitioner was liable on the note only to the extent of the payments actually made. We conclude that petitioner lacked an actual and honest profit objective. The videotape investment activity was devoid of economic substance, and therefore petitioners are not entitled to the investment tax credit or the distribution fee expense and depreciation deductions claimed in connection with the activity. As an aside, we address here petitioner's argument that the requisite profit objective is evident from petitioner's long history of highly speculative endeavors. The crux of this argument seems to be that because petitioner has made numerous other risky investments, some of which were financially successful, we should infer that his videotape acquisition was made with the objective that it would be profitable. To this we say, petitioner's active participation in carrying on a manufacturing or service-oriented business differs substantially from his passive noninvolvement in an activity like the one at issue here. We are concerned only with petitioner's objective for engaging in this activity and conclude from our factual analysis in this regard that he lacked the requisite *82 profit objective. Issue 2. Bona Fide Indebtedness of the Note
Although we have concluded that petitioners did not engage in the videotape investment activity for profit, they are nevertheless entitled, by virtue of sections 183(b)(1) and 163(a), to deduct any genuine interest payments they made on the related promissory note indebtedness. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983). The indebtedness on the note must have been bona fide. Knetsch v. United States, 364 U.S. 361, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960); Perrett v. Commissioner, 74 T.C. 111, 133-134 (1980). As we have said above, the $ 83,000 stated value of the note did not represent the true amount of underlying indebtedness. The only payments for which petitioner was truly subject to recourse liability were the seven annual purported interest payments of $ 2,000 and the $ 1,000 payment to convert the note to nonrecourse. The reality of the situation was that petitioner made combined payments of principal and interest over the 7-year period totaling $ 15,000. Petitioners are entitled to deduct *83 the portions of the annual payments allocable to interest. The parties are instructed to include in their Rule 155 computations a calculation of the amounts so allocable utilizing applicable Federal rates of interest. Issue 3. Additions to Tax
Respondent determined additions to tax for the years 1981 and 1982 pursuant to sections 6653(a)(1) and (a)(2). An amount equal to 5 percent of the tax deficiency is chargeable to petitioners under 6653(a)(1) if any part of the underpayment of tax was due to negligence or intentional disregard of rules or regulations. We have defined negligence in this context as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985). Under the circumstances of this case, petitioner should have known that his investment in the videotape production was nothing more than a sham transaction designed to provide him with tax advantages. We find that petitioner failed to act with the degree of care required of him. Since petitioners have offered nothing in the way of evidence to the contrary, we sustain the addition to *84 tax under section 6653(a)(1). Section 6653(a)(2) similarly imposes a separate addition to tax for negligence. The amount added is equal to 50 percent of the interest payable under section 6601 on the portion of the underpayment of tax attributable to negligence. Here, all of the underpayment for 1981 and 1982 resulted from the deductions and credits negligently claimed in connection with the videotape investment activity. As a result, the 6653(a)(2) addition to tax is equal to 50 percent of the interest due on the entire underpayment in each year. An addition to tax for a valuation overstatement under section 6659 was also determined by respondent for 1981 and 1982. Petitioners are liable for the addition under this section if each of the following conditions are met: (1) The adjusted basis in the videotape claimed by petitioners for depreciation purposes exceeded 150 percent of the correct valuation (sec. 6659(c)(1)), (2) petitioners held the videotape for no more than 5 years as of the end of the tax year to which the valuation overstatement applies (sec. 6659(c)(2)), and (3) the underpayment of tax for the taxable year attributable to the valuation overstatement was at least *85 $ 1,000 (sec. 6659(d)). The amount added to tax is equal to an applicable percentage of the underpayment of tax attributable to the overvaluation. Sec. 6659(a). Section 6659(b) sets forth the applicable percentages. [3]
Based upon our consideration of all the evidence in this case, we have determined that the videotape to which petitioners assigned a cost basis of $ 90,000 at the time of purchase in 1977, had a correct value of somewhere between $ 2,700 and $ 3,600. Petitioners claimed an adjusted basis in the videotape for 1981 and 1982 of $ 47,666 and $ 39,154, respectively. A valuation overstatement of more than 150 percent is readily apparent *86 and therefore the first condition of section 6659 is met. In fact, the overvaluation exceeds 250 percent in both years and should petitioners be found liable for the addition to tax, the applicable percentage for computing the amount is 30 percent of the underpayment attributable to the overvaluation. The second condition is that the videotape be "held by the taxpayer" no more than 5 years as of the end of the tax year to which the overvaluation applies. Petitioner entered into the agreement to purchase the videotape on December 20, 1977, and therefore, with respect to the 1981 tax year there is no doubt that petitioners held the videotape for less than 5 years as of December 31, 1981, and the condition is met. The 1982 tax year is not so clear. The agreement between petitioner and Metro calls for production and delivery of the videotape within 45 days of the date of the agreement. Consequently, there is a question of when the property came into existence for purposes of commencement of the 5-year holding period. The only pertinent piece of evidence is a copy of the Certificate of Registration of Claim to Copyright for videotape episode no. 52 of the series "Coping" issued *87 on December 29, 1977, by the U.S. Register of Copyrights (Joint Exhibit 18-R). Based on this evidence, we find that the holding period began prior to the end of 1977 and therefore the videotape was held by petitioners for more than 5 years as of the end of 1982. Accordingly, the condition that the asset be held for no more than 5 years is not met for the 1982 tax year, and petitioners are not liable for a section 6659 addition to tax for that year. For 1981, however, petitioners are liable for the addition to tax so long as the third condition is met -- that the underpayment of tax attributable to the overvaluation be at least $ 1,000. This determination is simply a matter of performing the necessary arithmetic which we leave for the parties as part of their Rule 155 computations. Issue 4. Tax Motivated Transaction
Respondent lastly determined that interest accruing after December 31, 1984, on the underpayment of tax for 1981, 1982, and 1983 is to be calculated in accordance with section 6621(c) at 120 percent of the regular interest rate established under section 6621(b). Petitioners are subject to the increased amount of interest for any one tax year if there is a *88 substantial underpayment attributable to a tax motivated transaction; "substantial" means greater than $ 1,000. Sec. 6621(c)(2). Included in the statutory definition of tax motivated transaction is "any sham or fraudulent transaction." Sec. 6621(c)(3)(A)(v). A transaction devoid of economic substance is a sham or fraudulent transaction. Fazzio v. Commissioner, T.C. Memo 1990-608; Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). In dealing with the merits of this case we have decided that petitioner invested in the Metro videotape with the objective of acquiring the attendant tax benefits and have concluded that the transaction lacked economic substance. The transaction was, therefore, a sham for avoiding income tax. Whether petitioners' underpayment of tax attributable *89 to a tax motivated transaction for 1981, 1982, and 1983 remains greater than $ 1,000 is a question that will be answered when the parties submit their Rule 155 computations. For those years where the underpayment is "substantial," we sustain respondent's determination of increased interest pursuant to section 6621(c). Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on the deficiency.↩
2. The factors listed in section 1.183-2(b), Income Tax Regs.↩, are (1) manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned from the activity, (8) the financial status of the taxpayer, and (9) elements of personal pleasure or recreation derived from the activity.
3. The percentages are to be determined in accordance with the following table which appears in section 6659(b): ↩
If the valuation claimed is the
following percent of the correct   The applicable
valuation --   percentage is:
150 percent or more but not more than 200 percent
10
More than 200 percent but not more than 250 percent
20
More than 250 percent
30