CAMERON E. BERRY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Berry v. Commissioner
Docket No. 33025-83
United States Tax Court
T.C. Memo 1991-145; 1991 Tax Ct. Memo LEXIS 164; 61 T.C.M. (CCH) 2295; T.C.M. (RIA) 91145; April 2, 1991, Filed *164 Decision will be entered under Rule 155. Cameron E. Berry, pro se. Steven M. Roth, for the respondent. FAY, Judge. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION This case was assigned to Special Trial Judge Helen A. Buckley pursuant to the provisions of section 7443A(b) of the Code and Rules 180, 181, and 182. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. FINDINGS OF FACT AND OPINION OF THE SPECIAL TRIAL JUDGE BUCKLEY, Special Trial Judge: Respondent determined a deficiency in petitioner's Federal income tax for the year 1978 in the amount of $ 25,049, together with additions to tax of $ 2,854 under section 6653(a) and $ 11,377 under section 6651(a)(1). The issues for decision are: (1) Whether petitioner acquired a videotape master copy *165 with an actual and honest profit objective; (2) Whether the promissory note he gave in partial consideration for the purchase of the videotape represented a bona fide indebtedness; and (3) Whether petitioner is liable for the aforementioned additions to tax due to negligence or intentional disregard of rules and regulations, or for the untimely filing of his 1978 Federal income tax return. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Petitioner, Dr. Cameron E. Berry, resided in Roseberg, Oregon, at the time he filed the petition in this case. This case involves petitioner's investment in a videotape production master copy. More specifically, it involves a videotape produced and sold by Metro Productions (hereafter Metro or the producer). We recently rendered our decision in Gerhart v. Commissioner, T.C. Memo 1991-35, a case dealing with a Metro investment arrangement essentially the same as the one at issue here. In Gerhart, we provided background on the videotape production and distribution industry which, rather than repeat here, *166 we incorporate herein by this reference. Petitioner is a physician by occupation. He came to know of Metro through a financial advisor who had previously recommended a number of real estate investments to petitioner. This financial advisor suggested that petitioner consider investing in a Metro videotape production. He advised petitioner of the attendant tax benefits and provided him with a prospectus and promotional materials. After consultation with his attorney and accountant, petitioner decided to acquire a half-hour videotape episode of a particular series from Metro. He made no effort to investigate Metro's qualifications as a videotape producer, nor did he look into its success rate in the industry. He did not inquire into, nor did he at the time of trial know, how many episodes were in the series, or who the other investors in the series were, if any. Neither petitioner, his attorney, accountant, nor financial advisor had any prior experience in or knowledge of the videotape production and distribution industry. All of petitioner's dealings with respect to his videotape investment were made through his financial advisor. Petitioner never dealt directly with a Metro *167 representative. A production service agreement (hereafter the agreement) was executed between Metro and petitioner on June 13, 1978. A Metro representative signed the agreement, however, petitioner does not recall ever having met this individual. The terms and conditions set forth in the agreement were accepted by petitioner as presented by Metro without negotiation. Petitioner did not seek an independent appraisal of the half-hour videotape production he ultimately purchased. In accordance with the agreement, Metro delivered the videotape to petitioner within 45 days of the date of the agreement. Petitioner relied upon his attorney and financial advisor to select the particular episode from the series purchased. All rights to episode no. 14 of the series entitled "Country Serenade," including the exclusive rights to distribute and license the videotape production, were transferred to petitioner. (Petitioner viewed the tape at a later time, but at trial could not recollect any of the personalities appearing in the episode.) As recited in the agreement, petitioner satisfied the $ 100,000 stated purchase price through an $ 8,000 down payment and execution of a $ 92,000 promissory *168 note (hereafter the note). Ostensibly to protect Metro against petitioner's default on the note, the agreement created a security interest in the videotape and required that petitioner furnish Metro with a completed financing statement. It is unknown whether Metro ever perfected its security interest via a U.C.C. filing. The note was executed by petitioner on the same date as the agreement, June 13, 1978. Under its terms, interest purportedly accrued on the unpaid balance of the note at a rate of 7 percent. The note further purported to be full recourse over an initial 5-year term. During the initial term, the note required minimum annual payments of $ 2,400 by January 10th of each year beginning with 1979. These payments were to be applied to accrued but unpaid interest. Additional payments on the note during the initial 5-year period were required only if net receipts were realized from distribution of the videotape in which case an established percentage of these receipts was to be applied first to unpaid accrued interest and then to principal. The note terms provided that at the conclusion of the initial 5-year term, the principal balance and unpaid accrued interest were *169 due and payable. However, if petitioner remained current with the minimum annual payments, he was entitled to extend the note for an additional term of 5 years. At any time during the renewal term, petitioner had the option to convert the note to nonrecourse by making a $ 1,000 payment towards principal. Minimum payments were not required on the note during the 5-year renewal term; a percentage of net receipts generated by the videotape, if any, would be applied to repayment of the note with unpaid interest and principal payable at the end of the term. In all material respects, the agreement and note executed for petitioner's acquisition of the Metro videotape are identical to the agreement and note executed between the taxpayer and Metro in Gerhart v. Commissioner, supra.
Petitioner warranted under the agreement to engage a management consulting firm to assist with distribution of the videotape rights. Again relying upon the advice of his advisors, petitioner engaged Mr. Jay Anderson as distribution consultant. Mr. Anderson was not experienced in the distribution of videotape productions, and in fact petitioner knew him to be a real estate developer. *170 Petitioner was unable to furnish a copy of the written distribution agreement supposedly entered into with Mr. Anderson and was unable to recall the nature of their arrangement. Furthermore, he has no recollection of the amount of distribution fees actually paid to Mr. Anderson, though he is sure distribution of the videotape was pursued until sometime in 1980. The videotape production was never successfully distributed, and petitioner realized no revenues from it. Approximately 6 to 8 months after petitioner acquired his videotape, an associate who had also invested in a Metro videotape advised petitioner that the Internal Revenue Service was questioning the legitimacy of tax deductions and credits being taken in connection with Metro investments. At some later time, prior to the filing of his 1978 Federal income tax return, petitioner was directly contacted by the Internal Revenue Service and advised that certain investments might not qualify for the tax benefits they purported to offer. Nevertheless, in his 1978 return, filed January 25, 1980, petitioner claimed an investment tax credit of $ 10,000 on his videotape purchase. In addition, on Schedule C he deducted $ 18,333 *171 of accelerated depreciation on the videotape (using an estimated 7-year life), $ 2,400 of interest paid on the note, and $ 250 for payment of a distribution service fee. Respondent disallowed each of these credit and deduction items. Tax year 1978 was the only year in which petitioner claimed credit or deduction amounts relating to the Metro videotape investment. Sometime in 1980 petitioner decided to discontinue pursuing distribution of the videotape. The record is silent as to whether petitioner defaulted on the note. OPINION Existence of Actual and Honest Profit Objective
Petitioner is entitled to the investment tax credit and other deductions respecting the videotape investment only if the purchase of the videotape and related expenses were made in connection with a trade or business or for the production of income. See sections 38 and 48, 162 and 167, and 212. Petitioner has not argued that he engaged in the trade or business of producing and distributing videotape productions; and indeed such an argument could not have been made seriously. Whether the investment in the videotape was made for the production of income hinges upon whether petitioner had, a part from *172 the desire to receive anticipated tax benefits, an actual and honest profit objective. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). An expectation of profit need not be reasonable, but the objective for profit must be actual and honest. Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984). Respondent contends that petitioner was motivated to purchase the videotape, not by an objective of profit, but by the tax avoidance attributes touted by the investment's promoters. Petitioner maintains that albeit his investment was highly speculative, he entered into it with the actual and honest objective of making a profit. In resolving this question, we note our decision in Rose v. Commissioner, 88 T.C. 386 (1987), *173 affd. 868 F.2d 851 (6th Cir. 1989). There we applied an objective analysis to determine whether an investment activity lacked economic substance and was therefore without a legitimate business purpose, i.e., without an actual and honest profit objective. Embodied within our Rose opinion are the section 183 concepts for determining whether a taxpayer activity was not engaged in for profit. In making such a determination, we have generally looked at the surrounding facts and circumstances and applied the nine factors enumerated in the regulations promulgated under section 183. [2] See Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Jasionowski v. Commissioner, 66 T.C. 312, 321 (1976). In Rose v. Commissioner, supra at 412-415, we held that where taxpayer investments possess certain characteristics of tax motivation it is more appropriate to apply an objective test; such a test being, inter alia, a more precise standard of review and yielding more consistent and predictable results. We identified the following characteristics *174 to be indicative of tax motivation: (1) Tax benefits were the focus of promotional materials; (2) the investors accepted the terms of purchase without price negotiation; (3) the assets in question consist of packages of purported rights, difficult to value in the abstract and substantially overvalued in relation to tangible property included as part of the package; (4) the tangible assets were acquired or created at a relatively small cost shortly prior to the transactions in question; and (5) the bulk of the consideration was deferred by promissory notes, nonrecourse in form or in substance.
*175 We referred to investments with these characteristics as generic tax shelters. Rose v. Commissioner, supra at 412-413. Petitioner's investment in the videotape episode of the series entitled "Country Serenade" possesses at least four of the above five characteristics (we cannot be certain of the first enumerated characteristic since the promotional materials are not part of the record, and no evidence of their content was adduced at trial), and we find that it was a generic tax shelter as we contemplated in Rose v. Commissioner, supra. Upon review of our decision in Rose, the Sixth Circuit chose not to accept our generic tax shelter test "because it does not aid us in the basic inquiry as to whether the transaction had any particular economic effect other than the creation of income tax losses." 868 F.2d at 853. The Sixth Circuit went on to state, however we characterize the test, "the essential inquiry is whether the transaction had any practicable economic effect other than the creation of economic tax losses." 868 F.2d at 854. Under the facts of this case, the outcome is the same when we *176 apply the section 183 nine-factor analysis. The next step in our analysis is to examine the dealings between petitioner and the videotape producer, the relationship between the sales price and fair market value of the videotape, and the structure of the financing. Dealings Between Petitioner and Metro. Aspects of the investment arrangement were atypical of the way videotape productions are marketed in the industry. For example, a large number of episodes of the series were produced prior to testing the marketplace. In addition, the producer did not seek distribution of the series as a whole, rather it sought third-party investors to pursue distribution of individual episodes. Neither petitioner nor any of the independent advisors he relied upon had any experience in or knowledge of the videotape production and distribution industry. Yet petitioner agreed to invest $ 100,000 in a videotape episode produced by Metro without investigating the company's qualifications and history of success or lack thereof in the industry, or without even so much as discussing the deal with a representative of the company. Furthermore, despite the fact the investment's success was contingent *177 upon the success of the videotape series as a whole, petitioner never expressed an interest in viewing any of the other episodes in the series or in knowing who the other investors were. The true nature of the transaction as a tax avoidance vehicle is also evident from petitioner's ready acceptance of Metro's proposed sale price and other terms and conditions without objection or negotiation. Petitioner showed an equal amount of unconcern about and uninvolvement in the selection of a distribution manager for his videotape. He acquiesced in the selection of Mr. Anderson despite the fact he knew Mr. Anderson had no experience in the distribution of videotape productions. Also very telling is petitioner's abandonment of the activity shortly after discovering that the tax benefits were being seriously questioned; the videotape's worth to petitioner was in the tax advantages he hoped to reap and not in the minute chances of its profitability. As we observed of the taxpayers in a case involving a nearly identical set of facts, petitioner in this case also "displayed extraordinary passivity and trustfulness in relying on the advice of [his] financial counselors" and "manifested inattention, *178 nonchalance and ignorance throughout the entire transaction." Janklow v. Commissioner, T.C. Memo 1988-46, 1988 Tax Ct. Memo LEXIS 40, 55 T.C.M. (CCH) 69, 75-76, T.C.M. (RIA) P88046 at 268-269. See also Gerhart v. Commissioner, supra. We conclude petitioner's dealings with respect to the acquisition of the videotape are objective indications that he lacked the requisite profit objective. Relationship Between Sales Price and Fair Market Value. Petitioner apparently maintains that his purchase of the videotape was at arm's length, and the price paid was the videotape's fair market value. He argues that the price paid includes his $ 8,000 cash down payment and the entire $ 92,000 promissory note given in exchange. We find this claim dubious at best. As discussed above, the indications are that petitioner bargained for the tax benefits and not for the real value of the asset acquired. Moreover, regardless of the form the transaction took, in substance the value given by petitioner included only the $ 8,000 down payment and the interest payments made on the note (the record reflects only one interest payment of $ 2,400 in 1978). Consequently, *179 we do not accept the assertion that the sale was made at arm's length for $ 100,000. At trial, petitioner made little additional showing on the videotape's fair market value. Through the testimony of a lay witness, he attempted to show that the tape was of a considerable value. He established that the witness was a longtime listener to country/western music, but failed to convince the Court she was an expert in the field of videotape production and distribution or that she otherwise qualified as an expert in evaluating videotape productions. Petitioner elicited the witness' opinion that the artists featured in "Country Serenade" had the potential for widespread popularity. We give her testimony little weight. The Court heard from respondent's expert witness, Mr. Frank Reel, who testified to the peculiarities of the videotape production and distribution industry. Mr. Reel is well known to this Court, having appeared in this capacity on a number of occasions. As we explained in Gerhart v. Commissioner, supra, his qualifications are impressive and his testimony particularly credible. Respondent filed with the Court a written appraisal prepared by Mr. *180 Reel. However, the videotape appraised in that report was not the videotape acquired by petitioner and in fact was not even a tape from the same series. [3] Thus, Mr. Reel's appraisal is of no value to this Court. Nevertheless, based upon Mr. Reel's testimony of the videotape production industry in general, we are convinced that as a single episode petitioner's videotape had essentially no value; therefore, its value was dependent upon the value of the series as a whole. We find that the fair market value assignable to petitioner's videotape purchase was substantially less than the $ 100,000 purported sale price and that this large disparity is further indication that the entire transaction lacked *181 economic substance. It is worth emphasizing here that petitioner had the burden of disproving respondent's valuation determination. Rule 142(a). Petitioner has failed to meet this burden. Structure of the Financing. Here we examine the nature of the financing arrangement to determine the likelihood that Metro and petitioner intended for the underlying debt to be repaid. Under the terms of the note executed by petitioner, Metro had full recourse against petitioner in the event of default during the first 5 years, but at the conclusion of that time petitioner had the option, upon payment of $ 1,000, to convert the note to a nonrecourse debt instrument. Upon exercise of the option, Metro's only protection in the event of default would have been to exercise its security interest in the videotape collateral -- the value of which, as we have already said, is substantially less than the purported amount of debt. There was no requirement that any portion of the principal amount of the debt be repaid during the first 5 years unless there were profits from the videotape's exploitation. Default during the first 5 years was not anticipated by either party to the agreement since it *182 was to petitioner's advantage to pay the required interest so as to receive the related tax benefits, i.e., deduction of the interest payments and depreciation of the inflated basis in the videotape. Once the tax benefits were exhausted, petitioner would have been able to extricate himself from personal liability on the note by merely paying $ 1,000. Metro too, benefited from this arrangement since it would have received total cash payments far in excess of the fair market value of the asset sold. It also had the right to repossess the videotape upon petitioner's eventual default on the note. In economic reality then, petitioner and Metro never intended petitioner to be responsible for the entire debt. Consistent with our decisions in Janklow v. Commissioner, supra; Rose v. Commissioner, supra; Waddell v. Commissioner, 86 T.C. 848 (1986), affd. 841 F.2d 264 (9th Cir. 1988); and Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986), we look through the form of the debt instrument to the actual substance *183 of the loan transaction and conclude that petitioner was not liable for the full value of the note, but only for the five minimum annual interest payments. We conclude that petitioner lacked an actual and honest profit objective. The videotape investment activity was devoid of economic substance, and therefore petitioner is not entitled to the investment tax credit or the distribution fee expense and depreciation deductions claimed in connection with the activity. Bona Fide Indebtedness of the Note
Although we have concluded that petitioner did not engage in the videotape investment activity for profit, he is nevertheless entitled, by virtue of sections 183(b)(1) and 163(a), to deduct any genuine interest payments made on the related promissory note indebtedness. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 96 (4th Cir. 1985), revg. in part 81 T.C. 184 (1983). The indebtedness on the note must have been bona fide. Knetsch v. United States, 364 U.S. 361, 5 L. Ed. 2d 128, 81 S. Ct. 132 (1960); Perrett v. Commissioner, 74 T.C. 111, 133-134 (1980). As we have said above, the $ 92,000 stated value of the note did not represent *184 the true amount of underlying indebtedness. The only payments for which petitioner was truly subject to recourse liability were the five required minimum annual interest payments of $ 2,400. Therefore, in reality, petitioner was liable for making combined payments of principal and interest over a 5-year period totaling $ 12,000. Petitioner is entitled to deduct that portion of the $ 2,400 paid in 1978 that is allocable to interest. The parties are instructed to include in their Rule 155 computations a calculation of the amount so allocable utilizing the applicable Federal rate of interest. Additions to Tax
Respondent determined an addition to tax pursuant to section 6653(a). An amount equal to 5 percent of the tax deficiency is chargeable to petitioner if any part of the underpayment of tax was due to negligence or intentional disregard of rules or regulations. We have defined negligence in this context as a "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioner contends he relied upon the expert advice of his financial advisor, *185 accountant, and lawyer in claiming the credit and deduction amounts relating to his videotape investment. Under certain circumstances, we have held that reliance upon the advice of tax experts is indicia of due care by the taxpayer. See, e.g., Industrial Valley Bank & Trust Co. v. Commissioner, 66 T.C. 272 (1976); Woodbury v. Commissioner, 49 T.C. 180 (1967); Nelson v. Commissioner, 19 T.C. 575 (1952). However, even if a proper showing of reliance in this case would absolve petitioner of negligence, petitioner has not so shown it. Prior to filing his 1978 Federal income tax return, petitioner became aware that the videotape investment might not qualify for favorable tax treatment, yet he chose not to heed the warning. Rather, he went ahead and claimed the tax benefits. His advance knowledge of the questionable nature of this tax treatment negates any notion of reliance. At any rate, petitioner should have known under these circumstances that the investment was a sham transaction designed to avoid tax. We find petitioner failed to act with the degree of care required of him. Since petitioner has offered insufficient *186 evidence to the contrary, we sustain the addition to tax under section 6653(a). A section 6651(a)(1) addition to tax was also determined by respondent. Under this section, failure to file a required return by the due date subjects the taxpayer to an addition to tax equal to 5 percent of the tax due for each month or fraction thereof that the return is late, not exceeding 25 percent in total. The taxpayer can avoid the addition to tax only if "it is shown that such failure is due to reasonable cause and not to willful neglect." Sec. 6651(a)(1). Petitioner's 1978 return was due April 15, 1979. It was filed on January 25, 1980, more than 9 months late. At trial petitioner's only explanation for the late filing was that during the relevant time period he "was going through some difficult personal problems." This explanation is not reasonable cause for the late filing. We sustain the addition to tax under section 6651(a)(1). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The factors listed in section 1.183-2(b), Income Tax Regs.↩, are (1) manner in which the taxpayer carried on the activity, (2) the expertise of the taxpayer or his advisors, (3) the time and effort expended by the taxpayer in carrying on the activity, (4) expectation that assets used in the activity may appreciate in value, (5) the success of the taxpayer in carrying on similar or dissimilar activities, (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned from the activity, (8) the financial status of the taxpayer, and (9) elements of personal pleasure or recreation derived from the activity.
3. This faux pas was a result of petitioner's failure to produce in advance of trial the documents requested by respondent. This left respondent to find out which videotape episode petitioner invested in by alternative means. Unfortunately, the alternative source of information relied upon by respondent proved inaccurate.↩